(70 App. Div. 395.)

### ZAPF v. CARTER et al.

(Supreme Court, Appellate Division, Fourth Department. March 11, 1902.)

1. ADVERSE POSSESSION—CO-TENANTS.

   A husband died intestate in 1876, seised of certain real estate, and survived by a widow and foster child, and by a brother and two sisters as his only heirs at law. After his death, his widow continued to occupy and lease the premises, paid the taxes and insurance, made repairs, collected rents, claimed to strangers that she owned the property, and endeavored to sell it, though there was no evidence that she gave notice to the heirs at law, who lived nearby, that she claimed adversely to them, In 1895 the widow died, devising the property to the foster child, who had meanwhile married and moved away, and she afterwards received the rents, etc. In 1899, the two sisters sold their claims to the land to plaintiff for a nominal sum, he having shortly before acted as agent for

the foster child in collecting the rents. The brother had already quit-
claimed to the foster child. *Held*, that though the possession of a ten-
ant, to become effective against co-tenants, must be more marked and
open than against strangers, the foster child had acquired title by adverse
possession.

**2. SAME—ESTOPPEL TO ASSERT TITLE.**

Action of the foster child in seeking to fortify her title and buy peace
by obtaining a quitclaim deed from one of the heirs at law did not estop
her from disputing the title of the other heirs at law.

Appeal from special term, Jefferson county.

Suit for partition by Francis X. Zapf against Lulu N. Carter,
impleaded with others. From a judgment in favor of plaintiff direct-
ing partition, defendant appeals. Reversed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, and
WILLIAMS, JJ.

George C. Carter, for appellant.
John Conboy, for respondent.

SPRING, J. Chauncey B. Ashley died intestate in the city of
Oswego in 1876, leaving, him surviving, his widow and no children,
but a brother and two sisters, his only heirs at law. In 1871 he
acquired by purchase the premises described in the complaint, and
owned the same undisputedly at the time of his death. After his
death his widow continued to occupy or lease the same to tenants,
who attorned solely to her until her death, which occurred Decem-
ber 31, 1895. At the time of the death of Chauncey Ashley there
was a mortgage covering the premises, upon which there was then
unpaid the sum of $450, and this lien was paid off and discharged
by the widow in 1877. During her occupancy the widow paid the
taxes, repaired the house on the lot, kept up the insurance, received
the rents, and claimed to strangers she was the owner thereof, and
endeavored to sell the same, although there is no evidence that she
gave any notice to the heirs at law, who were known to her, and
lived only a short distance from her, that she was claiming title
adversely to them. During this period the net rents received ap-
parently exceeded considerably all the expenses she incurred in man-
aging and repairing the property. In 1863 the defendant, then a
young girl of seven years, became a member of the family of Mr.
and Mrs. Ashley, assuming their name, and continued thereafter to
be treated as their daughter, and that was the ostensible relation
at the time of the death of Mr. Ashley. She was married in 1878,
and was then living with her foster mother, who had remarried to
a man named Spalisbury; and, while she moved West with her
husband, the filial relations remained unchanged during the lifetime
of Mrs. Spalisbury, whose husband died in 1888. Mrs. Spalisbury
left a will, giving the bulk of her property, real and personal, to
the defendant, and the only real estate of which she died seised was
that in controversy in this action. After the death of Mrs. Spalis-
bury the defendant received the rents from the property in question,
the plaintiff, who was the sole executor of the will mentioned, act-
ing as her agent. It soon developed that the defendant had no

record title to the premises described in the complaint, and the appeal book discloses considerable correspondence between the parties relative to this situation. In 1898 the defendant obtained a quitclaim deed from the brother of the said intestate for a nominal consideration. The plaintiff, on behalf of the defendant, endeavored to secure a like conveyance to her from the other heirs at law, but there was some hitch in the matter, and no deed was given. In July, 1899, the plaintiff acquired by quitclaim deeds the interests of these two heirs at law for the sum of $75, the entire property being worth from $800 to $1,000, and has commenced this action of partition to effect a division or sale thereof. The defendant sets up title by possession for more than 20 years in hostility to that of the legal owners by her testatrix and in herself after the death of her foster mother.

If Mrs. Spalisbury and the defendant had been strangers in title to the heirs at law of Mr. Ashley, unquestionably the acts of these occupants, although founded on no muniment of title, were ample to ripen into ownership by open, notorious adverse possession. Sections 371, 372, Code Civ. Proc.; Barnes v. Light, 116 N. Y. 34, 22 N. E. 441; Baker v. Oakwood, 123 N. Y. 16, 25 N. E. 312, 10 L. R. A. 387; Lewis v. Railroad Co., 162 N. Y. 202, 56 N. E. 540; Ang. Lim. c. 31, par. 373. The rule does not obtain in its severity where the occupancy is by one tenant in common, yet if that occupancy is open, notorious, visible, and by acts unequivocally conveying to the cotenants the information that the one in possession is holding in defiance of their co-tenancy instead of in subordination to it, that possession may be adverse and grow into a title by prescription. Jackson v. Whitbeck, 6 Cow. 632, 16 Am. Dec. 454; Van Dyck v. Van Beuren, 1 Caines, 13; Abrams v. Rhoner, 44 Hun, 507; Millard v. McMullan, 68 N. Y. 345, 352; Florence v. Hopkins, 46 N. Y. 182; Busw. Lim. par. 299. In Florence v. Hopkins (supra) the court say, at page 186:

"But often the possession of one of the tenants in common may become adverse by acts on his part amounting to an exclusion of his co-tenant."

Wood, in his work on Limitations, thus gives expression to the doctrine (volume 2 [2d Ed.] par. 266):

"Prima facie, the possession of one tenant in common is the possession of all;  *  *  *  but if one tenant in common enters upon the whole land, and takes the entire profits, claiming and holding exclusively for the whole statutory period, an actual ouster of his co-tenants may be presumed."

And in Angell on Limitations the following appears (6th Ed., par. 432):

"But it is not necessary, in order to prove that a tenant in common has claimed the whole exclusively, that it should be proved that he made an express declaration to that effect; for it may be shown clearly by acts as well as words. Law v. Paterson, 1 Watts & S. 191; Bracket v. Norcross, 1 Greenl. 89. Where one enters and takes the profits exclusively, and continuously for a long period, under circumstances which indicate a denial of a right in any other to receive them, as by not accounting, with the acquiescence of the other tenants, an ouster may be presumed in this country."

See, also, Boll v. Railroad Co., 102 N. Y. St. Rep. 139, 68 N. Y. Supp. 139. The authorities relied upon by the appellant do not in-

fringe upon this principle. In Knolls v. Barnhart, 71 N. Y. 474, the widow was in possession as dowress and guardian in socage of the minor heirs, and it was held that her occupancy was presumptively as tenant in common, and her attempt to buy in a title, and upon which no sufficient length of possession had existed in her to erect a title by operation of the statute of limitations by adverse possession, would inure to the benefit of the cestuis que trustent. The court decided that her "fiduciary relation to the property and to the heirs prevented her from purchasing or foreclosing the mortgage for her individual benefit," and also that "adverse possession was not found or proved." In Culver v. Rhodes, 87 N. Y. 348, the widow and daughter were in possession for more than 20 years, but her possession was that of the life tenant and also as trustee. During the running of the possession a judgment was recovered against her by her co-tenants in an action of waste committed by her on the premises, and there was no act of hers impeaching the title of the co-owners. The court, in discussing what is essential to create a title by adverse possession in favor of one co-tenant, say that there should be notice of the adverse holding to the co-tenant, "or unequivocal acts so open and public that notice may be presumed of the assault upon his title and invasion of his rights." We may therefore regard the doctrine as settled that one co-tenant may acquire title adversely which will oust that of her co-tenant, but in order to enable that holding to ripen into ownership the possession must be open and notorious, with an assertion of exclusive and hostile ownership. In the present case Mrs. Spalisbury received the rents and profits, paid off an outstanding incumbrance, repaired the property, paid the taxes, and it was continuously assessed to her. She repeatedly tried to sell it, and did by oral agreement dispose of a strip of the land. After her death the defendant continued the same open and exclusive ownership without disturbance until about the time of the commencement of this action. For 23 years, then, occupancy and averment of title continued without interruption. The heirs at law of Ashley were adults. Some of them lived near this land, and must have known of the exclusive and notorious character of the possession of Mrs. Spalisbury, and later of that of her foster daughter. After the death of the testatrix these heirs were willing to part with their legal interest for a small sum, which further tends to confirm the position that they had little faith in their ability to stand out against the title of the defendant. The referee finds the facts upon which this maintenance of title is based, but finds that there is no proof to show that it was in hostility to that of the heir at law. We think the presumption that she was occupying as a co-tenant was overcome by the character of the possession and the fact that none of the heirs at law made any claim of ownership, even after the death of the widow.

What constitutes adverse possession must always depend upon the facts of each case. The general principles of law governing such an occupancy have been long settled, and are stable and uniform. The possession of a co-tenant, to become effective against his co-owners, must be more marked and more open than against a stranger, and

of that character which is manifestly hostile to the claim of the co-tenants. In this case, every act essential to establish an exclusive ownership was committed by the defendant and her testatrix. Payment and the discharge of the mortgage indebtedness, continuous possession, keeping the property in repair, receiving rents, asserting title, paying insurance and taxes, with the assessments to Mrs. Spalisbury, and later to the defendant, constituted a series of acts which go to make up this claim of ownership, and are all which any owner would perform. Any one of these acts may have been insufficient to mature into a title by adverse holding, but all combined form a chain which irresistibly establishes it, and it is a significant fact in vindication of this claim that during this long possession the heirs at law were adults, and either lived, or visited at times, a short distance from the land, and never sought to disturb the conspicuous acts upon which ownership was being founded. To give notice to these heirs at law that the possession was with the view of claiming title would have been superfluous, for they must have known it. Nor is there anything in the relationship between these heirs at law and Mrs. Spalisbury which gives color to the suggestion that they were permitting her to occupy these premises in this exclusive way intending after her death to assert their title. She was their sister in law, and shortly after the death of her first husband, their brother, she re-married. She was not penniless, and the inference seems reasonable that if they had expected to claim title to this property they would have done so immediately upon the death of their brother. It may be that they knew of the existence of the mortgage lien upon the property and concluded that their interest in excess of this incumbrance was inconsiderable, and did not care ever to be invested with the possession or actual ownership of this property, and it is a noteworthy fact that after the death of Mrs. Spalisbury, when her foster daughter came into possession and assumed proprietorship of this property, and who was of no kin to these heirs at law, there was then no attempt on their part to obtain possession.

The defendant, in seeking to fortify her title and buy peace by obtaining a quitclaim deed from one of the heirs at law of the deceased Ashley, did not estop herself from disputing the title derived from the heirs at law. Greene v. Couse, 127 N. Y. 386, 28 N. E. 15, 13 L. R. A. 206, 24 Am. St. Rep. 458.

The course of the plaintiff in procuring the conveyances from the two sisters of Ashley does not require us to scan with too much minuteness the title of the defendant and her devisor. The plaintiff was the executor of the will, and learned that Mrs. Spalisbury did not have the legal title, and so advised the defendant. He acted as her agent in the collection of the rents, and endeavored to purchase the interests of these sisters of the decedent on behalf of the defendant for $10, which was the limit of his authority. After these negotiations had ceased, he purchased on his own behalf. To be sure he had ceased collecting rent, had settled with his principal, and his account as executor had been judicially settled, but he obtained title because of the knowledge he had acquired while acting for the defendant. The courts have uniformly condemned the acts by which an

agent obtains title to property to undermine his principal, and this conduct of the plaintiff is reprehensible in the extreme, although the referee by evidence which may be said to sustain it, has found he apprised the vendors he was buying the land for himself. The judgment should be reversed, and a new trial granted, with costs to the appellant to abide the event.

Judgment reversed, and new trial granted, with costs to the appellant to abide the event. All concur.